Our final case of the morning is Minocqua Brewing Company v. Hess. This is a fairly straightforward preliminary injunction in front of the Western District of Wisconsin, but unfortunately in their decision they used the wrong legal standard in denying our preliminary injunction. I guess I'll be addressing three points here. The first, obviously the causation standard that the District Court got incorrect, I guess the correct standard and then just the preliminary injunction standards. Obviously, as this Court's, I'm sure, well aware, a First Amendment claim requires the plaintiff to prevail to demonstrate that their activities were protected under the First Amendment. Their protective activities were but for cause of dependent's conduct and they suffered the actual deprivation because of that. Now, if we look kind of deeper into this standard, what we see is that as an initial showing, a plaintiff really only has to demonstrate that the sort of animus or the retaliatory intent for a First Amendment retaliation claim was a motivating factor in the deprivation and in the decision itself, the District Court seemed to require that it was the only factor, specifically they used the language, because of the protected speech, the deprivation occurred in denying a preliminary injunction. That's the incorrect standard under the case law cited. Instead, we just needed to show it was a motivating factor. I think the record makes it pretty clear that it was a motivating factor. When this Court looks at the record, they're going to see first there was an email from Brian Desmond to Corporation Counsel for Oneida County and the head of the Zoning Department discussing what they were going to do. What's your strongest argument here that your client's speech was a motivating factor for the committee's decision? So I think it starts with the email between Brian Desmond, Carl Jenrich, and Michael Fugel. But that wasn't with anybody on the committee. You've identified statements in conduct by officials other than members of the committee. So if we look specifically to committee actions, I think we see a couple of issues. The first is that there's really kind of just been very clear disparate treatment of the Monaco Brewing Company and Kirk Bankstead. The length of zoning applications has been significantly longer for them than for others. The hearings have been more arduous. There's been a lot of aggression from the Board against these two. But what's the link with the speech? So I think if we look to the link with the speech, when you look specifically into the briefing, what I think you see is that the Board talks a lot about Mr. Bankstead's Facebook posts that are directly critical of the Board and critical of themselves. And then when you pair that with the very clear disparate treatment, which I think is most obvious with the parking permit exemptions that were granted to every business within a mile of Mr. Bankstead's but his, it was like 174 over two years, and he could get three. I think you see that there is that connection there. There's very clear ways... But can we use those other businesses as appropriate comparables here, given that they didn't have the permit violations that your client did? So the parking issues actually started well before the permit violations. The parking issues go back to the original attempts at permitting. So they go back to 2021, or 2022, when the permitting process still initially started with the administrative review permit. And by the way, you don't dispute that your client continued to operate outdoors in 24 and 25 without the appropriate permits? We would not dispute that he operated outdoors in 2024 and 2025. Without the appropriate permits? Without 109 account, yes, yes, ma'am. Okay. Sure. You, you, you argue in the brief that the committee chair's statement conceded that compliance matters could be addressed through permitting conditions. Oh, and so the stated reasons for the denial were a pretext for First Amendment retaliation. But was the committee able to get the brewery to comply by imposing permitting conditions? So at the final hearing, Mr. Bankstead had completed all of the permitting conditions, to the best of my knowledge, and they were unable to point to anything he had not, he had not at that point completed. There was some question about some, some drainage, but no one was able to say that he had not completed the drainage or that the drainage wasn't appropriate. We had submitted a letter from an engineer saying the drainage was just fine and everything else had been completed. So at the point that the permit was denied, with everything they wanted having been completed, at least to the best of my knowledge, I think that you have to start looking for other reasons why there was this, this denial, and as we kind of go through the history of the, this, this dispute, and we've been in front of the federal court now several times. I think the only really clear answer to that is that it's retaliatory for either his speech, generally his criticism of these specific elected officials or his suits against the, the, or his prior suits against the county, and all of those are, are protected by the He will prevail on the merits of the final claim and the preliminary hearing should have been granted there, or at least we demonstrated that it was a motivating factor in, in the denial, in the denial of the conditional use permit. So moving on from, I guess, that point in specific to just the, the preliminary injunction standard in general, I think it's very clear that this is a First Amendment issue. There should be no question as to whether or not, if this is retaliation, there is irreparable harm here, and it should have been, Mr. Banks said it should have prepared. It seems like the court, though, in ruling in denying the motion really focused on likelihood of success on the merits. Certainly, yes, that was, I mean, that was where the, the, that was certainly where the bulk of the decision was. So I would just reserve the rest of my time for rebuttal. Certainly, Mr. Mills. Mr. Jones. Thank you. Good morning, and may it please the court. For over two years, Monaco Brewing Company and Mr. Bankstead continuously violated the Oneida County Zoning Ordinance and a conditional use permit that the county had granted them under the ordinance. That history of noncompliance led to my clients, the members of the Oneida County Planning and Development Committee, to deny a new identical conditional use permit for the appellants earlier this summer. The district court did not abuse its discretion in denying the appellants a preliminary injunction that would have required the county to grant them that permit. To put a . . . I'll tell you what one of my concerns in this case is, please. It's the extent to which the brewery is being punished on the basis of past behavior. I mean, perhaps this is not so much a First Amendment issue, but rather a due process issue. Suppose Mr. Bankstead decided to reform his behavior and become fully compliant with all state and local requirements to the letter. Is he forever banished from getting a permit in Monaco based on past rather than present violations? Well, I think an important point in that respect, Your Honor, is that when Monaco Brewing and went before the committee in June of this year seeking a new permit, not only did the committee have before it this essentially two-year-plus history of noncompliance with prior permits, both the prior administrative review permit and the prior conditional use permit, but it also had before it Mr. Bankstead's current then ongoing violation of the zoning ordinance insofar as he had been open all summer, was open the day of the hearing in violation of the ordinance because he didn't have a permit, and . . . Robert, would you try and answer the hypothetical question as it is presented? And, you know, I have to tell you, I knew you were going to answer the question the way you did. So if you could just, you know, can he ever, is he ever going to be able to get permits from this group? I'm reluctant to speculate on what permit application he will present to the committee and what circumstances would go along with that permit application. But no, there's, as a general proposition, there's no permanent bar. But the committee, again, was considering a situation where someone was in front of them asking for a permit who that very day was violating the ordinance by being open and had publicly stated, I don't care what you do, committee, I will continue to remain open even if you don't give me a permit. That is, he's representing to the committee, I will continue to violate the ordinance. That was the basis along with the past history for the committee's decision to deny the permit. And we would submit respectfully that that is a legitimate non-retaliatory reason for denying the permit. Are there other businesses that are allowed to operate without permits? There's nothing in the record as to other businesses who might be considered to be substantially or similarly situated who have been allowed to operate without permits, have been allowed to operate in substantial non-compliance with permits, let alone for an extended period of time like the record reflects here with the appellants. Mr. Melms, in response to your question, Your Honor, said no. There is no dispute here that he was open in violation of his permit in 2020-24 and he's been open in violation of the ordinance because he doesn't have a permit in 2025. There's nothing in the record to suggest or to allow for an inference that there are other businesses that are similarly situated. Are there other businesses, I don't want you to put labels on it, are there other businesses that are allowed to operate without getting the required permits? Don't put the similarly situated, because there's a suggestion from the other side that they are being punished here and you let other businesses continue operating even if they don't have the requisite permits. I don't think there's anything in the record to that effect. I don't think there's a factual basis for the district court to have drawn that conclusion or for the appellants to make that representation. Did the corporation counsel mean when he or she said that the county officials should be alert to Bankstead's social media posts so that, quote, you can determine what priority to give to the 9.78 rewrite? What does that mean? The reference in that email, 9.78 is a reference to a particular provision in the zoning court relating to signs, and I believe at the time the county was in the process of considering whether or not to rewrite its sign ordinance. So it was simply a reference to the fact that this may be relevant to your consideration of that sign ordinance. Is there an ordinance that prohibits the display of political signs by business establishments? In other words, on what basis did the county send the brewing company a letter demanding that it remove a political sign? The letter was sent, and this was in the fall of 2020, by the zoning administrator, not a member of the committee that's the defendant in this action. And he was simply acting on the understanding that that particular sign, as was the case with other signs he'd written a letter about, was too large under the ordinance. So it had nothing to do with the political view that the sign was promoting? The record, and this is by way of an affidavit from the zoning administrator, was that that was a letter written based on the size of the sign, and he had written other such letters regardless of the political or political affiliation of that sign. And that was the end of that. There's nothing about any sort of further enforcement action or attempt at enforcement by the zoning administrator or the county writ large, including this committee. And that particular piece of evidence, this was cited by Mr. Mills to the court, that letter about the sign, the former corporation counsel's email, that's from 2020, early 2021. Thereafter, this committee granted the appellants a conditional use permit. I may not get the phrasing right, but that's a significant intervening event. And I think that's important in terms of assessing whether some of those early disputes is relevant in considering the causation element. And I think the district court certainly viewed it that way. In the short time I have left, the issue that's front and center in the appellant's submissions to this court is about whether or not the district court got the causation element correct. And they point to two parts of the district court's- Whether the district court got it correct or whether it abused its discretion. Well, they make the point that the district court allegedly made an error of law. And I take them to argue that that constitutes an abuse of discretion by the district court. I don't think the district court got the law wrong. He summarized in a general way that there's a causation element and that they're required to prove cause. And any assertion by the appellants in their briefs that but-for cause isn't the standard, I think, is incorrect under the law. In the Avis, this court's decision in Gross v. Tano-Cicero, this court's decision in Kidwell v. Eisenhower all talk about but-for cause. The district court then went on to correctly apply that standard using the burden-shifting analysis of Mount Healthy and ultimately, I would say, reached the correct decision and certainly not one that is an abuse of the district court's discretion. Thank you, counsel. Anything further, Mr. Mellons? Yes, your honor. I would just like to address the issue of the intervening cause that Mr. Jones raised. I think, while it is certainly true that the McEvoy Brewing Company and Kirk Bankstead were granted a conditional use permit in 2023, I think the conditional use permit was problematic and it was intentionally so. If you look into the record, what you'll see is that the conditional use permit placed a lot of-gave a lot of power over the situation to the town of Minocqua, so much so that it resulted in two more suits or another suit in the Western District of Wisconsin for Mr. Bankstead and the Minocqua Brewing Company to be allowed to use a driveway that had been used by the prior business at that location without incident for nearly 20 years. I think that it's fairly clear that Oneida County was aware of the power they were giving the town of Minocqua and the fact that they were inserting what is effectively a poison pill into that conditional use permit. Now, Mr. Bankstead certainly accepted the conditional use permit because after a couple of years of fighting just to try and sell beer in a tourist town, he took it. Is he still operating today? He is maybe today. I don't know if they're operating during the week right now. Certainly, they were over the weekend. Over the summer, they operated over the weekend? Yes. Yeah, if this were August, they'd be operating today. I don't know if they're operating on a Monday in September. Whatever he received originally about the sign, did it say it's the size of the sign? It was about the size of the sign, Your Honor, but what I think is most interesting is that while the county claims that there was other enforcement, what they don't point to are any of the equally large Trump signs that were throughout Oneida County at the same time that did not receive any enforcement action. So, I guess they can... It was only Biden signs that... Mr. Bankstead's sign was the only one we were aware of that was targeted. And was his the only Biden sign in town? Certainly, in downtown Monaco, I believe it was, yes. Thank you. Thank you. Thank you very much. The case is taken under advisement, and the court will be in recess until 2 o'clock.